IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DAVID WILKERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-815-NJR-DGW |
| | ) | |
| RYAN HAMMOND, | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| and CHRISTINE BROWN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff David Wilkerson, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), initiated this action *pro se* on August 8, 2013, alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). In a nutshell, Plaintiff alleges that he was the victim of excessive force by Defendant Ryan Hammond, a correctional officer at Pinckneyville, and that he was denied medical treatment for the injuries Hammond inflicted. Plaintiff further alleges that he filed grievances after the incident with Hammond, which led correctional officers and healthcare professionals to retaliate against him by denying him access to showers and proper medical care, confiscating his wheelchair and its parts, and transferring him to another facility. Counsel was appointed to represent Plaintiff on October 9, 2014 (*see* Doc. 64).

The operative complaint, captioned Plaintiff's "First Amended Complaint" (Doc.

120), sets forth the following claims against Defendants Correctional Officer Ryan Hammond, Pinckneyville Health Care Administrator Christine Brown, Wexford Health Sources, Inc. ("Wexford"), and the IDOC:

Count 1:    Excessive force claim against Officer Hammond;

Count 2:    Deliberate indifference claim against Officer Hammond, Ms. Brown, and Wexford;

Count 3:    Conditions of confinement claim against Officer Hammond, Ms. Brown, and Wexford;

Count 4:    Retaliation claim against Officer Hammond and Ms. Brown;

Count 5:    Rehabilitation Act claim against the IDOC; and

Count 6:    Invasion of reasonable expectation of privacy claim against the IDOC and Wexford.

Defendants seek judgment as a matter of law on all six claims (*see* Docs. 123 and 127). Plaintiff filed timely responses to the motions for summary judgment (Docs. 132 and 133), and Defendants were granted leave to reply (Docs. 146 and 147). After carefully considering the briefs and all of the evidence submitted by the parties, the Court grants the motion for summary judgment filed by Wexford (Doc. 123) and grants in part and denies in part the motion for summary judgment filed by Defendants Christine Brown, Ryan Hammond, and the IDOC (Doc. 127).

## FACTUAL BACKGROUND

Plaintiff David Wilkerson has been incarcerated since 1993 (Doc. 128-1, p. 9), and he was at Pinckneyville from February 2010 to August 2012 (Doc. 133-9, pp. 2-3). Plaintiff is a paraplegic as the result of a gunshot wound in 1982 that damaged his thoracic vertebrae (Doc. 128-1, p. 9). He has been confined to a wheelchair since he was shot, and

he also requires a catheter and colostomy bag (*Id.*; Doc. 132-7, p. 10). Plaintiff also has a history of bedsores on his buttocks as a result of being confined to a wheelchair (*see* Doc. 132-7, pp. 11–13). During the time Plaintiff was at Pinckneyville, he was scheduled for regular showers in the health care unit ("HCU") and bedsore treatment in order to keep his wounds clean, covered, and dry so they did not worsen or become infected (Doc. 128-1, p. 37; Doc. 132-7, pp. 4–5; Doc. 133-9, pp. 2-3; *see* Doc. 120).

Defendant Christine Brown was the Healthcare Unit Administrator at Pinckneyville during the time period at issue (Doc. 128-2; Doc. 133-10, p. 3). Defendant Ryan Hammond was the front desk officer in the HCU on the second shift (from 3:00 p.m. to 11:00 p.m.) (Doc. 128-4, pp. 12, 13, 14). His job was to monitor all of the inmates who came in and out of the HCU for various appointments and emergency treatment (*Id.* at p. 15, 28).[1] There were also inmate workers in the HCU, whose job functions were established by the IDOC and who were trained by, supervised by, and reported to IDOC security personnel at the institution (*Id.* at pp. 128–29; Doc. 124-3, p. 2; Doc. 124-5, p. 3; Doc. 132-4, p. 8). There were two types of inmate workers in the HCU: inmate porters and health care unit specialists. The porters provided janitorial services, such as cleaning the showers, emptying trash, and perhaps running errands to pick up supplies (Doc. 124-5, p. 3; Doc. 133-10, p. 4). The specialists could do the same janitorial work as the porters, but they also might deliver food trays or water pitchers to the inmate-patients, make the beds, or help the inmate-patients get dressed (Doc. 133-10, p. 4; *see also* Doc. 132-6, p. 5). Both the security personnel and the Wexford employees could direct the

---

[1] Aside from the front desk officer, there was only one other officer assigned to the HCU — the infirmary officer. That officer stayed in the back and supervised the inmates housed in the HCU (Doc. 128-4, p. 28).

inmate workers to do various tasks in the HCU (Doc. 132-4, p. 6; Doc. 132-6, p. 4; Doc. 133-10, p. 5).

Showers were scheduled by and under the control of the IDOC and security personnel at Pinckneyville (Doc. 124-2, pp. 2, 3, 5; Doc. 124-3, p. 3; Doc. 124-5, p. 2. *See also* Doc. 128-4, pp. 31–32, 34–35, 38, 40). For inmates like Plaintiff who were escorted from segregation to the HCU to shower, a correctional officer would go to the inmate's cell, cuff him, escort him to the HCU, lock him in the shower, and uncuff him; when the inmate was finished showering, the officer would recuff him, let him out of the shower room, and escort him back to his cell (Doc. 124-2, p. 2; Doc. 128-4, pp. 40, 44–45).

In order to shower in the HCU, Plaintiff required assistance to transfer from his wheelchair to the shower chair and vice versa (*see* Doc. 128-1, pp. 16–17). According to Plaintiff, the inmate porters in the HCU helped him make these transfers (*Id.*; *see also* Doc. 128-4, p. 50). Plaintiff testified that these inmate porters were not adequately trained, and as a result, they hurt him when they grabbed him in the "wrong area" and sometimes they dropped him (Doc. 128-1, pp. 15, 16). Plaintiff claims that he complained to Ms. Brown and to various physicians about the use of inmate porters in the HCU to help him transfer, but they disregarded his complaints (*Id.* at p. 27).

On June 6, 2012,[2] Plaintiff was brought to the waiting room of the HCU so that he could shower and receive treatment for his bedsores (*see* Doc. 128-1, pp. 38–40). While he

---

[2] The briefs and evidence before the Court include conflicting dates as to when the incident with Defendant Hammond occurred. In particular, during Plaintiff's deposition and in the IDOC Defendants' motion and supporting memorandum, the incident was repeatedly said to have occurred on June 20, 2012; however, Plaintiff's response to the IDOC Defendants' motion (Doc. 133) indicates that the incident took place on June 6, 2012, and the IDOC Defendants admitted this fact in their reply (Doc. 146). Thus, the Court adopts the date of June 6, 2012, because it appears that the parties have no dispute at this time that the incident occurred on that date.

was waiting to shower, he was handcuffed, and his wheelchair was pointed to face the wall (*Id.* at p. 40). Plaintiff alleges that some other inmates were talking, making jokes, and laughing (*Id.* at pp. 39–40). At his deposition, Plaintiff said he didn't know what the inmates were laughing and joking about; however, in a prior grievance, Plaintiff indicated that they were making jokes and comments about Officer Hammond (Doc. 128-1, p. 39; Doc. 47-4). Plaintiff testified that Officer Hammond "just ran up and grabbed me and caught me by surprise and rammed me numerous times into the wall," into the wheelchair of another inmate, and into the door (Doc. 128-1, pp. 40, 41). Officer Hammond then started yelling at Plaintiff and told him he would make sure Plaintiff never came to health care again (*Id.* at p. 47). As a result of this incident, Plaintiff asserts he suffered a bruise and knot on his head and a broken, bleeding toenail (*Id.* at pp. 41-42).

Officer Hammond's side of the story is that he pushed Plaintiff's wheelchair to face the wall because Plaintiff refused to obey orders to stop talking (Doc. 128-4, p. 93; Doc. 133-13). Officer Hammond said that Plaintiff then began acting belligerently and shouting threats at Hammond (Doc. 128-4, p. 93; Doc. 133-13). At that point, Officer Hammond decided to remove Plaintiff from the HCU because he was causing a disturbance; Hammond wheeled Plaintiff to the front of the HCU so that another guard could take Plaintiff back to his cell (Doc. 128-4, pp. 93, 107–108, 110). Officer Hammond further testified that when he was moving Plaintiff, he inadvertently caused Plaintiff's wheelchair to "tap" another inmate's wheelchair (*Id.* at p. 93; Doc. 133-13). Officer Hammond denies that Plaintiff's wheelchair ever made contact with the wall or the door

frame (Doc. 128-4, pp. 93, 111, 112; Doc. 133-13).

The day after the incident with Officer Hammond in the HCU, Plaintiff wrote a grievance (*See* Doc. 133-1). Plaintiff also filed a grievance on July 4, 2012, complaining more generally about the lack of accommodations available at Pinckneyville for his disability (*See* Doc. 133-12; Doc. 47-1, pp. 10–11). At his deposition, Officer Hammond indicated he was aware Plaintiff filed a grievance concerning the June 6th incident because he was contacted by Plaintiff's counselor (Doc. 128-4, p. 87). Ms. Brown indicated she had no particular recollection of any grievances filed by Plaintiff; however, the grievance officer's responses to the June 7th and July 4th grievances indicate that Ms. Brown was contacted as part of the investigation into Plaintiff's complaints (Docs. 133-13 and 133-14).

About a week after the incident with Officer Hammond, correctional staff in the segregation unit removed the armrests and footrests from Plaintiff's wheelchair without medical consent (Doc. 133-5, p. 9; *see* Doc. 133-16). Shortly thereafter, on June 20, 2012, Plaintiff's shoe became caught in his wheelchair due to the missing footrest, and he fell out of his chair (Doc. 133-5, p. 9; *see* Docs. 133-17 and 133-18). Correctional staff in the segregation unit also confiscated Plaintiff's wheelchair, leaving him confined to his bed, for an unknown period of time between June and August 2012 (Doc. 133-5, pp. 7-8).

Plaintiff testified that from June 20th until he was transferred out of Pinckneyville in August 2012, he was offered, but refused to take, a shower (Doc. 128-1, p. 43). Plaintiff claimed that he had to refuse showers because the inmate porters were causing him pain and sometimes dropped him while they were transferring him to the shower chair (*Id.* at

p. 16). The Court notes, however, that at one point in his deposition Plaintiff contradicted this testimony and indicated that he was not offered inmate assistance for showers following the incident with Defendant Hammond (*Id.* at p. 50). In any event, during the time Plaintiff was not taking showers, he could not properly clean his bedsores; he did his best to clean the wound in his cell by wiping it off and cleaning it with a rag (*Id.* at p. 25). Plaintiff did not have any gauze, tape, or diapers available to cover the wound, despite requesting these materials from various nurses and HCU personnel, including Ms. Brown (*Id.* at pp. 25-26, 33).

Plaintiff testified that, during the time period he refused to shower, he went to the HCU two or three times to receive treatment for his bedsore (Doc. 128-1, p. 25). Plaintiff's medical records indicate he was indeed seen on three occasions by a nurse (June 25, 2012, June 29, 2012, and July 19, 2012) and evaluated on two occasions by a physician (June 26, 2012, and July 3, 2012). It is not clear, however, if Plaintiff's bedsore was evaluated at these appointments (*see* Doc. 128-3).

On August 22, 2012, Plaintiff was transferred to Menard Correctional Center ("Menard") (Doc. 133-9, pp. 2-3). Upon arriving at Menard, Plaintiff was admitted to the infirmary to receive treatment for his bedsore, described as a decubitus ulcer to his left buttock that required daily wet-to-dry dressing (Doc. 133-19). Wet-to-dry dressings are required for a stage two or three bedsore with a break in the skin (Doc. 133-6, p. 12). On September 10, 2012, Plaintiff complained that his bedsore had developed a foul smell, and the nurse noted it had developed green drainage (*Id.* at p. 13; Doc. 133-20). A culture taken from Plaintiff's bedsore on September 10 indicated that Plaintiff had a

Methicillin-Resistant Staph Aureus ("MRSA") infection that required Plaintiff to be placed in contact isolation (Doc. 133-6, pp. 13-14; Doc. 133-21). Plaintiff received intravenous antibiotics to treat the infection (Doc. 133-6, Doc. 133-6, pp. 14-15).

### DISCUSSION

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

**I.   Excessive Force Against Officer Hammond**

In Count One, Plaintiff claims that Officer Hammond used excessive force on June 6, 2012 (Doc. 120). Specifically, Plaintiff testified that he was sitting in his wheelchair, facing the wall, and without any provocation whatsoever, Officer Hammond came up behind Plaintiff and rammed Plaintiff's wheelchair into the wall, into another inmate's wheelchair, and into a door frame. Plaintiff claims that he hit his head on the wall and broke his toenail.

"The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the 'unnecessary and wanton infliction of pain' on prisoners." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). An excessive

force claim has two components. The first is subjective and focuses on the defendant's motive for his conduct, namely "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004) (quoting *Hudson*, 503 U.S. at 6). "In conducting this inquiry, a court must examine a variety of factors, including 'the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner.'" *Outlaw*, 259 F.3d at 837. The second component is objective and asks whether the alleged wrongdoing was "objectively harmful enough to establish a constitutional violation." *Hudson*, 503 U.S. at 8.

Officer Hammond focuses solely on the subjective component in his motion (*see* Doc. 128). He asserts that he is entitled to judgment as a matter of law on this claim because Plaintiff was unable to explain why he ran Plaintiff's wheelchair into the wall, and therefore Plaintiff failed to put forth any evidence that the force used was applied in a malicious or sadistic manner (Doc. 128, p. 5). The Court disagrees. At his deposition, Plaintiff was asked "Why do you think it was that Ryan Hammond would have run your wheelchair into the wall?" and Plaintiff responded "your guess is as good as mine." (Doc. 128-1, p. 46). This testimony suggests that Officer Hammond rammed Plaintiff's wheelchair into a wall, a door, and another inmate's wheelchair, without any explanation and for no articulable reason. A reasonable jury could rather easily infer that Officer Hammond's actions were, by their very nature, sadistic and malicious. Officer

Hammond disputes, of course, that he rammed Plaintiff's wheelchair into anything. *See supra* p. 5. Consequently, there is a genuine dispute of a material fact — mainly, whether Officer Hammond applied force and whether that force was applied maliciously and sadistically or to restore discipline. As such, Officer Hammond is not entitled to judgment as a matter of law on Count One.

The IDOC Defendants also included a general, "catch-all" argument concerning qualified immunity in their motion for summary judgment (Doc. 128, p. 18). They did not, however, elaborate on how that immunity applied to Officer Hammond with respect to this claim (*see id*.). In any event, the Court finds this argument unavailing because it is clearly established law that a prison official cannot apply force maliciously and sadistically to cause harm, and as the Court just explained, there is at least some evidentiary support that Officer Hammond did exactly that.

## II. Deliberate Indifference re: Medical Care Claims

### A. Officer Hammond and Ms. Brown

In Count Two, Plaintiff asserts Officer Hammond and Ms. Brown acted with deliberate indifference by failing to ensure that he received prompt and adequate medical care for his bedsores and the injuries sustained from the June 6, 2012, incident (Doc. 120).

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165

F.3d 587, 590 (7th Cir. 1999). First, a plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, a plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

The Court will first analyze whether Plaintiff has demonstrated that his medical condition was "objectively, sufficiently serious." An objectively serious medical condition includes "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessary for a doctor's attention."). It also includes a "condition that significantly affects an individual's daily activities or the existence of chronic and substantial pain." *Hayes*, 546 F.3d at 522-23 (quoting *Gutierrez*, 111 F.3d 1373). "Notably, '[a]medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)).

With regard to the incident on June 6th, the evidence indicates that Plaintiff had a bruise and knot on his head and a broken, bloody toenail after Officer Hammond allegedly ran his wheelchair into the wall. There is nothing that suggests, however, that

these injuries were severe or required medical attention (although the Court is mindful that Plaintiff claims he requested medical care, but it was denied). Plaintiff made no mention of these injuries when he was seen by a nurse on June 25, 2012 (*see* Doc. 128-3).[3] And Plaintiff has not provided any evidence that his injuries resulted in significant pain or had an enduring effect. Therefore, the evidence—even when viewed in a light most favorable to Plaintiff—does not demonstrate that Plaintiff's injuries from the June 6th incident were severe enough to reach constitutional proportions. *See, e.g., Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (finding that inmate with swollen cheek and split lip from altercation did not have objectively serious medical need); *Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991) (concluding that a one-inch cut and scraped elbow were not objectively serious injuries). Because Plaintiff's injuries sustained on June 6th did not constitute an objectively serious medical condition, Officer Hammond and Ms. Brown cannot be held liable for deliberate indifference, even if they failed to provide or seek medical attention for those injuries as Plaintiff claims.

As for Plaintiff's bedsores, Defendants do not contest that bedsores, particularly infected bedsores, constitute an objectively serious medical condition (*see* Doc. 128). Thus, the issue for the Court is whether Officer Hammond and Ms. Brown acted with deliberate indifference.

Deliberate indifference "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference

---

[3] Plaintiff complained about injuries from falling out of his wheelchair on June 20th, but not about any injuries from the incident on June 6th (*see* Doc. 128-3).

is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). A prison official acts with deliberate indifference if he knows of a serious risk to the prisoner's health and consciously disregards that risk. *Holloway*, 700 F.3d at 1073. Put differently, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Greeno*, 414 F.3d at 653 (citation omitted). A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

Plaintiff argues that summary judgment on this claim must be denied because there is evidence that Defendants Hammond and Brown were both "aware of Plaintiff's history of bedsores" and "subjectively aware of the risks posed to Plaintiff by his bedsores" (*see* Doc. 133, p. 20). Plaintiff further argues that despite having this knowledge, Defendants Brown and Hammond effectively prevented Plaintiff from accessing the showers and receiving medical treatment (*Id*). Specifically, Plaintiff claims that Hammond and Brown ordered inmate porters to assist him in transferring from his wheelchair to the shower chair (*Id*). Because the inmate-assisted transfers were so unbearably painful, Plaintiff was forced to refuse those transfers, which in turn prevented him from accessing the showers (*Id.*). Because he could not shower, he was deprived of his ability to adequately clean his bedsores, which became infected and

necessitated intravenous antibiotic treatment (*Id.*). The Court concludes that Plaintiff's reasoning is far too tenuous, and the evidence supporting his argument is far too limited, to overcome Defendants' motion for summary judgment on this claim.

Officer Hammond testified he generally understood that Plaintiff likely suffered from bedsores because he was confined to a wheelchair and that bedsores could become infected (Doc. 128-4, pp. 77–80). Hammond also testified that he knew Plaintiff was refusing to take showers for a time period (*see* Doc. 128-4, pp. 88, 89). But that is the extent of Hammond's knowledge in this situation. There is no evidence that Hammond knew Plaintiff refused to take a shower because he did not want an inmate porter to help him transfer from his wheelchair to the shower chair. There is no evidence that Hammond knew that the inmate porters inflicted pain on Plaintiff when they assisted him. And there is no competent evidence that Hammond ever ordered inmate porters to assist Plaintiff in transferring from his wheelchair to the shower chair,[4] let alone that he continued to do so even though he knew it would lead Plaintiff to refuse to shower. Finally, there is no evidence that Plaintiff ever told Hammond, or that Hammond otherwise knew, that Plaintiff's bedsores were worsening and getting infected. In other words, Hammond knew that Plaintiff was being offered regular showers but not taking them; however, Hammond had no reason to know *why* Plaintiff was not showering or to suspect that he could possibly remedy the situation. And while Hammond generally knew about the risk of bedsore infections, he had no reason to know that risk had

---

[4] Plaintiff asserts in his response brief that Hammond gave these orders, but Plaintiff's assertion itself is not evidence, and none of the materials submitted by the parties supports this assertion. *Outlaw v. Newkirk*, 259 F.3d 833, 839 n.2 (7th Cir. 2001) (citing *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 361 (7th Cir. 1992) (ruling that "[a]rgument is not evidence upon which to base a denial of summary judgment").

become a reality for Plaintiff. In light of the gaps in Officer Hammond's knowledge, no reasonable juror could conclude that his actions were plainly inappropriate.

The same goes for Ms. Brown. Like Officer Hammond, she testified that she knew Plaintiff suffered from bedsores and that bedsores could become infected (Doc. 133-5, pp. 9–10). And if Plaintiff's assertions are believed, Ms. Brown also knew that Plaintiff objected to the use of inmate porters.[5] But Plaintiff's assertions are far too vague for the Court to infer that Ms. Brown also knew *why* Plaintiff objected to the use of inmate porters. There is no other evidence showing that Plaintiff ever told Ms. Brown that the inmate porters inflicted significant pain on him when they helped him transfer from his wheelchair to the shower chair. There is likewise no evidence that Ms. Brown knew Plaintiff stopped taking showers, let alone that his reason for doing so was because he did not want an inmate porter to help him get on the shower chair. There is also no

---

[5] Plaintiff's deposition testimony contains the following exchanges:

Q: What evidence do you have that it was Wexford that directed the inmates transfer you?
A: Because I complained to them about it. *You, know, I complained to the health care administrator.* They ignore it, disregard it. The thing is, they were aware of it. I brought my complaint to their attention and they didn't do nothing about it so it's obvious. (Doc. 128-1, pp. 26–27) (emphasis added).
***
Q: Okay. Did you ever receive medical treatment from Christine Brown?
A: That's the health care administrator. Just refer my complaints.
Q: She didn't come to your cell?
A: Yes. She have come to my cell one time.
Q: Okay.
A: Christine very aware of my health condition as well.
Q: Okay. Why did she come to your cell?
A: The same reason, about the showers, my bedsore treatment.
Q: Okay. But she didn't come there to provide you medical treatment?
A: No.
Q: Did she come there in response to a grievance?
A: No. So happen I called her over there on the 1 wing. She didn't particularly come over there to address my issues. She came for somebody else and I happened to call her, got her attention.
Q: All right. Did you address your issues to her while she was in the seg unit?
A: Yeah. In the seg unit as well in the health care unit too when I had came for like my lab. I came for lab work and I think the eye doctor. (Doc. 128-1, pp. 47–48).

evidence that Ms. Brown ever ordered inmate porters to assist Plaintiff in transferring; in fact, she adamantly testified at her deposition that inmate porters should never assist with transfers of handicapped inmates (Doc. 132-5, p. 5). And there is also no evidence that Plaintiff ever told Ms. Brown, or that she otherwise knew, that his bedsores were worsening and getting infected. In other words, Ms. Brown generally knew about the risk of bedsores, and she possibly knew that Plaintiff did not like it when inmate porters helped him, but she had no reason to know, or to even suspect, that the use of porters would lead Plaintiff to refuse to shower. Additionally, because she did not know that Plaintiff was refusing to shower, she had no reason to know, or even to suspect, that Plaintiff's bedsores were worsening. Once again, given the gaps in Ms. Brown's knowledge, no reasonable juror could conclude that her actions were plainly inappropriate. For these reasons, Defendants Hammond and Brown are entitled to summary judgment on Count Two.

### B. *Wexford*

In Count Two, Plaintiff alleges that Wexford, as a corporation, violated his Eighth Amendment rights by "instituting a policy or practice of providing inmate-assisted medical care and transport to Plaintiff" (Doc. 120). As a result of this practice, Plaintiff alleges that he suffered pain and was forced to refuse showers, which were necessary to clean himself and prevent infection of his bedsores (Doc. 120).

Under controlling precedent, a private corporation that contracts to provide essential government services can be held liable under § 1983, but only if "the constitutional violation was caused by an unconstitutional policy or custom of the

corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1024 (2015); *see also Monell v. Dep't of Social Serv. of N.Y.C.*, 436 U.S. 658 (1978). A plaintiff must show that corporate policymakers were "deliberately indifferent as to the known or obvious consequences" of the policy or custom. *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303.

Here, Plaintiff provided evidence establishing that inmate workers were utilized in the HCU to assist him (and perhaps other disabled inmates) in transferring from his wheelchair to the shower chair. Plaintiff also provided some evidence that these inmate workers dropped him and/or caused him pain due to their lack of training and failure to maneuver him properly. Plaintiff did not, however, provide any evidence that the general policy or practice of using inmate workers in the HCU was instituted by Wexford. Plaintiff also did not provide any evidence that the specific policy or practice of using inmate porters to assist disabled inmates in transferring to the shower chair was instituted by Wexford. Instead, all of the evidence in the record suggests that the policy or practice was instituted by the IDOC (*see* Doc. 133-10; 132-5). Specifically, the evidence shows that inmate showers were scheduled and controlled by the IDOC security personnel, and inmates were escorted to their showers and monitored by correctional officers. This evidence implies that the officers would have been the ones to direct the porters to help Plaintiff transfer to the shower chair. In fact, Plaintiff did not testify, and

nothing in the record otherwise indicates, that a Wexford employee ever directed an inmate porter to help Plaintiff transfer to the shower chair.

Simply put, the evidence before the Court suggests that the use of inmate porters to assist with inmate transfers in the HCU was by way of an IDOC policy, not a Wexford policy or practice. And Plaintiff has not provided the Court with any precedent for holding an entity liable for failing to intervene with respect to an unconstitutional policy or practice adopted by a separate and distinct policymaking entity. For these reasons, Wexford is entitled to judgment as a matter of law on Count Two.

### III.   Deliberate Indifference re: Conditions of Confinement

#### A.  *Officer Hammond and Ms. Brown*

In Count Three, Plaintiff asserts that Officer Hammond and Ms. Brown were deliberately indifferent in violation of the Eighth Amendment with respect to his conditions of confinement by causing his bedsores to become infected when they denied him access to proper medical care and showers (Doc. 120).

Prison officials violate the Eighth Amendment "if they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show that a prison official knew of a prison condition that presented an objective, sufficiently serious risk of harm, yet disregarded that risk by failing to take reasonable measures to address it. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008).

While the Court finds that Plaintiff's inability to shower may be considered an unconstitutional deprivation given the particular circumstances of this case, Plaintiff has not provided sufficient evidence for a reasonable jury to conclude that Officer Hammond and Ms. Brown acted with deliberate indifference to Plaintiff's health or safety. *See Jaros v. Ill. Dep't of Corrections*, 684 F.3d 667, 670 (7th Cir. 2012) ("Adequate food and facilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities,' that must be afforded prisoners.") (internal citation omitted).

As previously discussed, the evidence shows that Ms. Brown knew Plaintiff was unhappy about inmate porters assisting him with his showers, and Officer Hammond knew Plaintiff refused to shower for a period of time. But there is no evidence that either of them ever knew the reason behind Plaintiff's complaints and actions was that the inmate porters caused him severe pain when they assisted him. There is also no indication that Plaintiff ever complained to Hammond or Brown that his bedsores were worsening because he was not regularly showering. And most importantly, there is no indication that Hammond or Brown were in control of, or continued ordering, inmate-assisted transfers. Consequently, there is nothing from which a reasonable jury could conclude that Officer Hammond or Ms. Brown had actual knowledge of an impending harm to Plaintiff and consciously refused to prevent it. *See Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996). For this reason, Defendants Hammond and Brown are entitled to judgment as a matter of law on Count Three.

### B. Wexford

In Count Three, Plaintiff asserts that Defendant Wexford subjected him to

unconstitutional conditions of confinement by instituting a policy or practice that forced Plaintiff to utilize untrained inmates as porters to access the shower facilities in the HCU (Doc. 120). As with the deliberate indifference claim against Wexford, Plaintiff's conditions of confinement claim against Wexford also must fail because there is no evidence on which a reasonable jury could conclude that the policy complained of was instituted by Wexford. For the reasons set forth above, Wexford is entitled to summary judgment on Count Three.

## IV.  Retaliation Claims Against Officer Hammond and Christine Brown

In Count Four, Plaintiff alleges that Officer Hammond and Ms. Brown retaliated against him for filing grievances by removing the armrests and footrests from his wheelchair, confiscating his wheelchair for an indeterminate period of time, obstructing his access to showers and medical treatment, and ultimately transferring him from a medium to a maximum security facility (Doc. 133, p. 23).

It is well-settled that a prison official who takes action in retaliation for a prisoner's exercise of a constitutional right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). At the summary judgment stage, a prisoner has the initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski,* 705 F.3d 237, 251 (7th Cir. 2012)).

Here, the evidence before the Court is not sufficient for Plaintiff to make his *prima facie* case for retaliation against Officer Hammond and Ms. Brown. It is undisputed that Plaintiff filed grievances related to the incident on June 6, 2012, as well as the lack of accommodations for his disability while at Pinckneyville, and filing grievances is a recognized, protected First Amendment activity. *See DeWalt*, 224 F.3d at 618. But the evidence, when viewed in the light most favorable to Plaintiff, does not demonstrate that Defendants engaged in the retaliatory actions about which Plaintiff complains.

With respect to the removal of the armrests and footrests from Plaintiff's wheelchair, as well as the confiscation of the wheelchair, Plaintiff has not presented evidence beyond his own speculation that Defendants were involved in these incidents. The evidence shows that officers in the segregation unit removed the armrests and footrests and also confiscated Plaintiff's wheelchair. There is no indication that Officer Hammond was one of those officers or that he otherwise knew of the incidents. And there is no reason to suspect he was somehow involved given that he worked in the HCU, not the segregation unit. As for Ms. Brown, the evidence shows that she was informed about the removal of the wheelchair parts by Shift Commander Reginald Hammonds (Doc. 133-5, p. 7; *see* Doc. 133-16). Ms. Brown responded, essentially chastising the officers who took the parts because the armrests on Plaintiff's chair *had* to be removable since he was a paraplegic, and because the officers did not have medical consent to remove the parts (Doc. 133-5, p. 7; Doc. 133-16; Doc. 133-17). Her response also indicates that she attempted to locate the missing parts but was unable to do so (Doc. 133-5, p. 7; Doc. 133-16). As for the incident where Plaintiff's wheelchair was

confiscated, Ms. Brown testified that upon learning Plaintiff's wheelchair had been taken by the officers in segregation, she went to the unit and told them they had to give his wheelchair back to him (Doc. 133-5, p. 7). This evidence simply does not implicate either Defendant Hammond or Brown in the actions complained of regarding Plaintiff's wheelchair.

As for Plaintiff's assertion that Officer Hammond and Ms. Brown prevented him from accessing showers and receiving medical treatment, the Court again finds that Plaintiff has not provided evidence establishing that these Defendants were involved in those actions. In particular, the Court notes that at his deposition Plaintiff testified that he was offered but refused showers following the June 6th incident in the HCU. Further, Plaintiff has not introduced evidence that either Officer Hammond or Ms. Brown ever directed an inmate to assist Plaintiff in transferring to the shower chair, let alone that they did so in order to inflict pain on Plaintiff or because they knew he would refuse to shower. With regard to Plaintiff's medical care, he testified that he did receive treatment for his bedsores following the June 6th incident, but his medical records evidence that he was seen on numerous occasions between this date and the date of his transfer to Menard Correctional Center. Further, the evidence suggests there was only one instance where Officer Hammond or Ms. Brown took action to prevent him from receiving medical care—the June 6th incident where Officer Hammond kicked Plaintiff out of the HCU without his shower and without letting him see a nurse for the bump on his head and his bloody toenail. This refusal took place *before* Plaintiff filed his grievances, however, and therefore it obviously could not been in retaliation for filing the

grievances. Thus, the Court finds that no reasonable jury could conclude that either Officer Hammond or Ms. Brown took any action to prevent Plaintiff from receiving showers or medical care.

Finally, with regard to Plaintiff's claim that Defendants retaliated against him by transferring him from Pinckneyville (a medium security facility) to Menard (a maximum security facility), the record is again devoid of any evidence that these Defendants were involved with, or even recommended, that transfer. Both Hammond and Brown testified that they had no control over Plaintiff's transfer to Menard (Doc. 128-4, p. 140; *see* Doc. 133-5, p. 11). Plaintiff offered absolutely no evidence to the contrary. In fact, the only other evidence that is before the Court concerning the transfer is the date it occurred.

For these reasons, the Court finds that Plaintiff has failed to establish his *prima facie* case that Officer Hammond and Ms. Brown engaged in retaliatory acts, and Defendants Hammond and Brown are entitled to judgment as a matter of law on Count Four.

## V.    Rehabilitation Act Claim against the IDOC

In Count Five, Plaintiff alleges that the IDOC unlawfully discriminated against him in violation of the Rehabilitation Act by failing to accommodate his physical impairments, which prevented him from accessing the showers and medical treatment on the same basis as other inmates (Doc. 120).

The Rehabilitation Act prohibits any program or activity that receives federal financial assistance from discriminating against a disabled individual solely because of his or her disability. 29 U.S.C. § 794; *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004). To

prevail on a claim under the Rehabilitation Act, Plaintiff must establish that he is a qualified person with a disability and that the IDOC denied him access to a program or activity because of his disability. *Jaros* v. *Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

In this instance, it is undisputed that Plaintiff, as a wheelchair-bound paraplegic, is a qualified person with a disability. *See Jaros*, 684 F.3d at 672 (explaining that "[d]isability includes the limitation of one or more major life activities, which include walking [and standing . . . ."); 29 U.S.C. § 705(9)(B); 42 U.S.C. §12102(1)(A). And "[a]lthough incarceration is not a program or activity, the meals and showers made available to inmates are." *Jaros*, 684 F.3d at 672 The Supreme Court has recognized that refusing to make reasonable accommodations is tantamount to denying access. *Id.* (quoting *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006)) (other citation omitted).

The IDOC contends that Plaintiff has failed to put forward any evidence that he was discriminated against based on his disability. In support of this argument, the IDOC points to Plaintiff's deposition testimony where Plaintiff describes the accommodations that were made for him as "good" and indicates that he was provided with accessible cells, doors, shower rails, and chairs (Doc. 128-1, p. 62). Plaintiff asserts, on the other hand, that he was constructively denied access to showers insofar as the IDOC failed to reasonably accommodate his disability by using untrained inmate porters, rather than medical professionals, to transfer him to and from his wheelchair when showering in the HCU. As such, the main issue before the Court is whether the utilization of inmate

porters without specialized training to assist Plaintiff was a reasonable accommodation for his disability or whether it effectively denied Plaintiff access to showers. The Court finds that there is insufficient evidence in the record to resolve such an issue at the summary judgment stage. Accordingly, Count Five against the IDOC will proceed to trial.

The IDOC also argues that "since Plaintiff is no longer incarcerated at Pinckneyville, his Rehabilitation Act claim is now moot" (Doc. 128, pp. 17–18). But the IDOC failed to provide any support or citation to any authority for this bald assertion (*see id.*). And the Supreme Court has indicated that compensatory damages are available in private causes of action under the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *see also CTL ex rel. Trebatoski v. Ashland School Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). Thus, the Court finds Defendant's argument lacking and unpersuasive, and the Court shall not address it further at this time.

Finally, the Court notes that Defendant IDOC included a general, "catch-all" argument concerning qualified immunity in its motion for summary judgment (without providing an argument specific to any particular claim). As qualified immunity only shields defendants in their individual capacity from money damages, it is inapplicable to the IDOC, an arm of the State of Illinois. *See Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 427 (7th Cir. 1991).

## VI.   Invasion of Privacy Claim Against the IDOC and Wexford

In Count Six, Plaintiff claims that he was forced to involuntarily disclose and expose his medical condition (catheter and colostomy bag) to inmate porters who were

ordered to assist him in transferring from his wheelchair to the shower chair at the behest of the policy or practice of Defendants IDOC and Wexford.

Under Illinois law, to prevail on a claim for the tort of invasion of privacy by intrusion upon seclusion, a plaintiff must establish the following four elements: (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) that the intrusion was offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurred was private; and (4) that the intrusion caused anguish and suffering. *Horgan v. Simmons*, 704 F.Supp.2d 814, 821 (N.D. Ill. 2010); *Karraker v. Rent-A-Ctr., Inc.*, 239 F. Supp. 2d 828, 838 (C.D. Ill. 2003); *Johnson v. K-mart Corp.*, 723 N.E.2d 1192, 1196 (Ill. App. Ct. 2000). Generally, matters that may be subject to such an invasion include a person's financial, medical, or sexual life, or a peculiarly private fact of an intimate, personal nature. *See Zboralski v. Monahan*, 446 F.Supp.2d 879, 884 (N.D. Ill. 2006) (citing *Acosta v. Scott Labor LLC*, 377 F.Supp.2d 647, 649 -650 (N.D. Ill. 2005)).

Plaintiff implicates Wexford in his invasion of privacy claim by alleging that Wexford instituted a policy or practice that forced Plaintiff to utilize other inmates for assistance with the shower facilities in the HCU, which exposed his medical conditions to these inmate porters. Similar to his deliberate indifference and conditions of confinement claims, Plaintiff's invasion of privacy claim against Wexford must fail because there is no evidence on which a reasonable jury could conclude that the policy or practice complained of was instituted by Wexford. As such, the Court reiterates the reasoning set forth above and finds that Wexford is entitled to summary judgment on Count Six.

As for the IDOC, its argument for summary judgment on this claim is lacking in particularity and authority; nevertheless, the Court finds that the evidence in the record is insufficient for a reasonable jury to conclude that the IDOC invaded Plaintiff's expectation of privacy. At the outset, the Court notes that this claim is relatively novel in the context of incarceration. With regard to Fourth Amendment privacy rights in prison, the Seventh Circuit Court of Appeals has found that prisoners enjoy at least some protection against unreasonable searches and seizures of their persons. *See Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d 694, 697 (7th Cir. 1998). That right is limited, however, by the significant deference given to prison officials to run their institutions without court intervention. *See id.*

Recognizing that privacy rights in prison are necessarily limited, the Court finds that Plaintiff has failed to provide sufficient evidence for a reasonable jury to conclude that the IDOC policy and practice complained of invaded any reasonable expectation of privacy. Specifically, Plaintiff has failed to provide evidence that the intrusion was unauthorized or caused anguish and suffering. First, while the Court is well aware that Plaintiff refused inmate-assisted transfers to the shower chair from June 6th to sometime in August because he was sometimes dropped and roughly handled, Plaintiff failed to provide evidence that he ever objected to inmate-assisted transfers on the basis that he was being forced to expose his medical conditions. Moreover, there is no evidence before the Court that this policy or practice caused Plaintiff to suffer any anguish or had any effect on his mental state whatsoever. Indeed, during his deposition, Plaintiff never intimated that inmate-assisted transfers caused him any embarrassment by exposing his

medical condition; rather, Plaintiff merely complained that these inmate porters would mishandle him and cause him pain. Further, while the Court recognizes Plaintiff's assertion that individuals with colostomy bags suffer from negative associations and a life-long stigma of disgust impacting their mental and emotional well-being, Plaintiff has failed to introduce evidence that the IDOC policy or practice complained of caused him to *personally* suffer, especially in light of the necessary limitations incarceration places on one's ability to maintain a colostomy bag and catheter in private. For these reasons, the Court finds that the IDOC is entitled to judgment as a matter of law on Count Six.

### CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendant Wexford (Doc. 123) is **GRANTED**, and the Motion for Summary Judgment filed by Defendants Christine Brown, Ryan Hammond, and the Illinois Department of Corrections (Doc. 127) is **GRANTED in part and DENIED in part**. Counts Two, Three, Four, and Six are **DISMISSED in their entirety**, and Christine Brown and Wexford Health Sources, Inc. are **DISMISSED** from this action.

The only remaining claims are Count One against Defendant Hammond for excessive force and Count Five against Defendant IDOC for violating the Rehabilitation Act. A jury trial will commence at 9 a.m. on **Tuesday, August 2, 2016**; a final pretrial conference will be held at 1:30 p.m. on **Wednesday, July 20, 2016**.

**IT IS SO ORDERED.**

**DATED:   June 21, 2016**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**United States District Judge**